# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7661 | **DATE** | 3/29/2002 |
| **CASE TITLE** | NOREEN GOULD vs. DANIEL BARRETT, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The Court grants in part and denies in part the Evergreen defendants' summary judgment motion [36-1]. The Court grants the motion as to Count V, Count VI, and Count VII (Title VII claims) and hereby dismisses those counts. The Court denies the motion as to Count VIII. Because all of the claims against Tim Curtin and First Union Corp. have been dismissed, the Court hereby terminates them as parties. Only Barrett and Evergreen remain as defendants. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | 3 number of notices | Document Number |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | | MAR 2 9 2002 date docketed | |
| | Notified counsel by telephone. | | | | 64 |
| ✓ | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | | MAR 2 9 2002 date mailed notice | |
| CG | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NOREEN GOULD, | ) | **DOCKETED** |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAR 29 2002 |
| v. | ) | 99 C 7661 |
| | ) | |
| DANIEL BARRETT, individually, | ) | Judge Ronald A. Guzmán |
| TIM CURTIN, individually, FIRST | ) | |
| UNION CORPORATION, and | ) | |
| EVERGREEN INVESTMENT | ) | |
| SERVICES, INC. d/b/a Evergreen | ) | |
| Funds, a corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In this diversity case, plaintiff Noreen Gould ("Gould") has sued First Union Corporation ("First Union"), Evergreen Investment Services, Inc. ("Evergreen") and Tim Curtin ("Curtin"), (collectively "Evergreen defendants") for intentional infliction of emotional distress (Count V), negligence (Count VI), gender discrimination, retaliation, and harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Count VII), and violations of the Illinois Wage Payment and Collection Act, 820 ILL. COMP. STAT. 115/1 *et seq.* (Count VIII).[1] Pending is the Evergreen defendants' Motion for Summary Judgment as to Counts V through VIII. For the reasons provided in this Memorandum Opinion and Order, the Court grants the motion as to Counts V, VI, and VII and denies the motion as to Count VIII.

---

[1] Gould has also sued Daniel Barrett for intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, intentional intrusion upon personal seclusion, and tortious interference with contract. Barrett does not join the other defendants in the present motion.

# FACTS[2]

The following facts are undisputed unless otherwise noted. Evergreen employed Gould as a Vice President Mutual Fund Wholesaler for the state of Illinois from May 1997 until January 3, 2000. (Defs.' LR 56.1(a)(3) ¶¶ 2, 10.) Evergreen is a subsidiary of the First Union Corporation. (Pl.'s LR 56.1(b)(3)(B) ¶ 130; Defs.' LR 56.1 (a)(3) ¶ 14.) During 1999, Curtin was Senior Vice President National Sales Manager for Evergreen and Gould's direct supervisor. (Pl.'s LR 56.1(b)(3)(A) ¶¶ 2-3.) Daniel Barrett ("Barrett"), a resident of Rockland, Massachusetts, was an inside wholesaler at Evergreen until June 1998. (Defs.' LR 56.1(a)(3) ¶¶ 48-50.)

Gould worked from an office located in her home in Barrington, Illinois. (*Id.* ¶ 2.) Gould was guaranteed compensation of $175,000.00, if she met certain conditions, including: (1) being in good standing as of Dec. 31, 1999, and being "on course" to achieve an overall performance rating of at least "meets expectations" and (2) "fully comply[ing] with all applicable administrative and personnel policy requirements." (*Id.* ¶ 188.) Gould was also eligible for a non-recurring retention payment of $50,000 if she (1) "remained an employee in good standing with Evergreen through June 30, 2000;" and (2) "achieved at a minimum a 'meets expectations' rating on her 1999 performance review." (*Id.* ¶ 189.)

Curtin communicated "basic job expectations" to Gould and other employees. (*Id.* ¶ 14.) However there were no formalized job descriptions or external wholesaler standards for 1999; they were formalized at the end of 1999 for 2000. (*Id.* ¶ 12.)

---

[2] Apparently, the numbering system in the Evergreen defendants' word processing software went haywire after LR 56.1(a)(3) ¶ 165. Gould's response simply mirrors defendants' erroneous numbers. This glitch resulted in two sets of different statement of facts numbered ¶ 158 through ¶ 165. Neither party felt it important to apprise the Court of this numerical error. To avoid confusion, the Court will refer to both sets of paragraphs 158 through 165 with the page number on which the paragraph appears, e.g., "(Defs.' LR 56.1(a)(3) ¶ 158 (p. 25).)" or "(Pl.'s LR 56.1(b)(3)(A) ¶ 158 (p. 43).)

On May 27 and again on May 29, 1999, Daniel Barrett, then a former employee of Evergreen, called Gould's business number and left a total of three messages consisting solely of recorded music. (Defs.' LR 56.1(a)(3) ¶¶ 51-52.)   On June 1, the next business day, Gould notified Evergreen's Assistant Vice President of Telecommunications, Bud Spellman about the calls. (*Id.* ¶ 53.) Spellman traced the calls to a phone number in Boston, gave the number to Gould, and told Gould to contact her local police department and file a report, which she did the following day. (*Id.* ¶ 54.)

Two weeks later, Gould received four more calls from Barrett consisting of recorded music, pounding sounds, insulting remarks and offensive language in a threatening tone of voice. (*Id.* ¶ 55.) Gould called Spellman to report the calls on Monday, June 14, 1999. (*Id.* ¶ 56.) Spellman gave Gould the name and number of a contact person at the telephone company and told Gould that he notified Joan Goodwin ("Goodwin"), First Union's Vice President of Human Resources and the head of Evergreen's human resources department of the calls. (*Id.* ¶¶ 36, 57; Pl.'s LR 56.1(b)(3)(B) ¶ 124.) Plaintiff filed a second police report with the local police and gave the reporting officer the information Spellman had given her. (Defs.' LR 56.1(a)(3) ¶ 58.)

On June 17, 1999, Gould called Goodwin and played the voice messages for her. (*Id.* ¶ 59.) On July 9, 1999, Gould informed Tim Curtin of the phone calls. (*Id.* ¶ 61.)

On July 11, 1999, Barrett placed two more telephone calls to Gould's business phone number. (*Id.* ¶ 63.) The first message consisted of insulting remarks and offensive language. (*Id.*) The second message consisted of a threat to physically hurt

and kill Gould.[3]  (*Id.*)

Gould forwarded the messages to Goodwin and Curtin the day she received them. (*Id.* ¶ 65.) Gould also left a message on the FBI's voice mail. (*Id.*) FBI Agent Joe Pasquesi returned Gould's telephone call and instructed Gould to contact her local police and her company, then call him back.  (*Id.* ¶ 66.)

On July 12, Gould received a message from Curtin telling her that she should "get passed (sic) it."[4]  (*Id.* ¶ 69.) Gould was upset by Curtin's voice mail because she felt Curtin's message meant that she did not matter. (*Id.* ¶ 72.)

After reviewing her employee handbook on Tuesday, July 13, 1999, Gould contacted First Union Security.  Darlene Hathaway of First Union Security returned Gould's call. (Pl.'s LR 56.1(b)(3)(A) ¶ 76.)  Later that day, Goodwin and Don Giordano, the head of Evergreen's security, called Gould.  Gould gave Giordano FBI Agent Pasquesi's name and phone number and told Giordano that she wanted to involve law enforcement. (Defs.' LR 56.1(a)(3) ¶ 83.)

On July 14, 1999 Gould participated in a conference call with First Union representatives and Agent Gianturco of the Boston FBI office.  (*Id.* ¶ 84.)  After the

---

[3] The Court finds Gould's attempt to provide the exact language of the second message by including the quotation within the text of her response brief without having provided such language in either her LR 56.1(b)(3)(A) response or her LR 56.1(b)(3)(B) statement of additional facts, violates the letter and the spirit of LR 56.1, a rule that this Court strictly enforces.  Accordingly, the Court, in its discretion, will not consider the particular language.

[4] The full message reads,

> Hey Noreen, it's Tim.  Wow, it's the first time I've heard.  That's, uh, creepy.  We're tracking it down ASAP.  That is not fair.  Sorry.  Anything I can do, let me know, but I hope you can mentally get passed (sic) it, and realize that it's threatening only in regard that it's over the phone.  If it's coming from as far away as Boston, that's obviously creepy, and hope you have a good, full week planned. Get passed (sic) it like I said.  This week, you know, the week before the promo.  Good luck.  Take care.  I'm in Charlotte.  If you need anything just ring me or·voicemail.  I'll give you a call.

(Defs.' LR 56.1(a)(3) ¶ 69.)

conference call, Gould met with FBI Agent Pasquesi and Jack Hummer of the Barrington Police and played Barrett's messages for them. (Defs.' LR 56.1(a)(3) ¶ 87; Pl.'s LR 56.1(b)(3)(A) ¶ 89.)

The next day, Gould received two phone calls from Bill Ennis, Evergreen's CEO. (Pl.'s LR 56.1(b)(3)(A) ¶¶ 91, 93.) Darlene Hathaway arranged for a security guard for Gould's home. (*Id.* ¶ 95.) Evergreen paid for the security guard to stay from 9-10 p.m. until dawn, from July 15 until Gould installed a security system in her home on July 21. (*Id.* ¶ 94; Defs.' LR 56.1(a)(3) ¶ 97.)

On July 23, 1999, Gould received a call from FBI Agent Gianturco who told her (1) that he had found the identity of the caller; (2) the caller was an ex-Evergreen employee; (3) Gould should not worry because FBI Agent Gianturco determined that the threats were not real; (4) FBI Agent Gianturco told the caller not to make any more threats; and (5) Gould and her husband should try to have a good weekend. (Defs.' LR 56.1(a)(3) ¶ 100.) Following this call, Gould made a series of telephone calls to Agent Gianturco and Goodwin in which she attempted to learn the caller's identity. (Pl.'s LR 56.1(b)(3)(A) ¶¶ 102-08.) Goodwin told Gould that the FBI had instructed Goodwin not to disclose the caller's identity because she could jeopardize the investigation and prosecution of the caller. (Defs.' LR 56.1(a)(3) ¶ 103.) Gould became very upset and called Goodwin "insane." (Pl.'s LR 56.1(b)(3)(A) ¶¶ 102, 104, 106.)

In the following week, Gould contacted several parties, including attorney Dan Wolf, and attempted to discover the identity of the caller. (Defs.' LR 56.1(a)(3) ¶¶ 109-19.) On July 30, 1999, Hathaway informed Gould that First Union had retained an

outside attorney named Damien LaPlaca. (Pl.'s LR 56.1(b)(3)(A) ¶ 122.) Gould called

LaPlaca and told him that she had an attorney (Wolf). (Defs.' LR 56.1(a)(3) ¶ 123.)

LaPlaca informed Gould and Wolf that the caller was Barrett. (*Id.* ¶ 145.)

LaPlaca sent Gould and Wolf a copy of the criminal complaint that AUSA McFeely had

filed against Barrett in the U.S. District Court for the District of Massachusetts. (*Id.* ¶

146.) LaPlaca informed Gould of the progress of the criminal case against Barrett. (*Id.*

¶¶ 147-48.) [5]

On August 26, 1999, LaPlaca obtained a Temporary Restraining Order against

Barrett on Gould's behalf in Suffolk County, Massachusetts. (*Id.* ¶ 149.) On September

1, 1999, LaPlaca obtained a Preliminary Injunction Order against Barrett. (*Id.* ¶ 151.)

On October 26, 1999, Gould filed a lawsuit in the Circuit Court for the Nineteenth

Judicial Circuit, Lake County, Illinois seeking damages against Barrett and Evergreen for

intentional infliction of emotional distress, negligence, and, against Barrett only, for

tortious interference with contract. Defendants subsequently removed this lawsuit to the

Northern District of Illinois. Gould has since filed an amended complaint and added her

Title VII claims.

Because of the threats she had received, Gould did not attend a sales meeting at

Evergreen's offices in Boston on August 17, 1999. (*Id.* ¶ 124.) On August 19, 1999,

Curtin called Gould. (*Id.* ¶ 137.) Curtin reminded Gould that he was her supervisor and

she should have notified him about missing the August 17, 1999 meeting. (*Id.* ¶ 130.)

Curtin also asked if Gould was still working because she had not turned in any expense

reports for the month of July. (*Id.* ¶ 137.) Gould told Curtin that she did her expenses

---

[5] On October 29, 1999, Barrett entered a plea agreement with the U.S. Attorney's Office in Boston with
regard to a violation of 47 U.S.C. § 223 (a)(1)(C) for harassing phone calls. (Defs.' LR 56.1(a)(3) ¶ 153.)

for July, but in the first or second week of August. (Pl.'s LR 56.1(b)(3)(A) ¶ 137.)

Gould felt she was being harassed. (Pl.'s LR 56.1(b)(3)(B) ¶ 80; Pl.'s LR 56.1(b)(3)(A) ¶ 180.) Gould told Curtin that the conversation was documented and that if he wanted to speak to her again he could do so through her attorneys. (Defs.' LR 56.1(a)(3) ¶ 181.) After speaking to Gould on August 19, 1999, Curtin told Goodwin and Mike Treske (former President of Evergreen) that he was no longer going to speak with Gould and that in his words, "She is setting us up for a lawsuit." (Pl.'s LR 56 (b)(3)(B) ¶ 97.) Gould and Curtin did not speak to each other again after August 19, 1999. (Defs.' LR 56.1(a)(3) ¶ 181.)

On August 20, Gould received revised 1999 sales goals via facsimile. (*Id.* ¶ 164.) Curtin changed all of his wholesalers' stated sales goals two or three times in 1999 to achieve an accurate "footing" or total. (*Id.* ¶ 163.) It is undisputed that Gould met her stated sales goal for 1999. (Pl.'s LR 56.1(b)(3)(B) ¶ 34.)

Maryanne Bruce became the president of Evergreen in September 1999. (Defs.' LR 56.1(a)(3) ¶ 40.) During her first ten months as President, Bruce terminated and/or accepted resignation as an alternative to termination of at least six Evergreen wholesalers, including Gould. (Defs.' LR 56.1(a)(3) ¶ 165.) With the exception of Gould, all of the wholesalers identified for termination during this period were male. (*Id.* ¶ 168.) Bruce terminated these wholesalers for a variety of reasons including, but not limited to: (i) expense violations; (ii) poor sales; (iii) low sales; (iv) untimely reporting; (v) attitude problems; (vi) violation of company policy. (*Id.* ¶ 166.)

Gould was terminated on January 3, 2000. (Defs.' LR 56.1(a)(3) ¶ 10.) Bruce states her reasons for Gould's termination were: (1) poor quality sales; (2) violation of

expense policy; (3) failure to communicate with supervisor; (4) failure to submit activity reports and calendars; and (5) failure to make sales calls as well as visit and entertain customers in her territory. (*Id.* ¶ 170.)

## Discussion

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences in a light most favorable to the non moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). For the purposes of summary judgment, the movant has the burden of proving that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

### I. Tort Claims Against First Union and Evergreen

Gould seeks to hold First Union and Evergreen liable for their negligence in failing to enforce policies and procedures, which in essence is a claim for negligent supervision of employees for the failure to enforce policies and procedures, as well as for

intentional infliction of emotional distress for the conduct of Curtin.[6]  First Union[7] and

Evergreen argue, and the Court agrees, that these claims against them are barred by the

Illinois Workers' Compensation Act ("IWCA"), 820 ILL. COMP. STAT. 305/1 *et seq.*

> Section 305/5(a) of the IWCA provides in pertinent part:
> No common law or statutory right to recover damages from the employer .
> . .for injury or death sustained by any employee while engaged in the line
> of his duty as such employee, other than the compensation herein
> provided, is available to any employee who is covered by the provisions
> of this Act . . . .

820 ILL. COMP. STAT. 305/5(a).  Further, the Act states: "The compensation herein

provided, together with the provisions of this Act, shall be the measure of the

responsibility of any employer . . . ."  820 ILL. COMP. STAT. 305/11.  There are four

exceptions to the IWCA's exclusivity provisions.  *Contreras v. Suncast Corp.*, 129 F.

Supp. 2d 1173, 1183 (N.D. Ill. 2001).  "Plaintiff can maintain his personal injury actions

if he shows that his injury (1) was not accidental; (2) did not arise from his employment;

(3) was not received during the course of his employment; or (4) was not compensable

under the Act."  *Naszke v. Federal Express Corp.*, No. 94 C 6084, 1996 WL 450832, at

*6 (N.D. Ill. Aug. 6, 1996).

Because the negligent and intentional conduct of which Gould complains arose

from her employment (Defs.' LR 56.1(a)(3) ¶ 157), was received during the course of her

employment (*id.*), and is compensable under the Act (*see Collier v. Wagner Castings Co.*,

81 Ill. 2d 229, 237 (1980) (intentional infliction of emotional distress compensable under

---

[6] Although Curtin adopts the arguments of First Union and Evergreen, it is clear that Gould's claim against him for intentional infliction of emotional distress is not barred by the IWCA, *see Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 472 (1990) (stating IWCA exclusivity provisions do not bar employees from pursuing intentional tort action against co-employees).

[7] For purposes of this portion of the opinion, the Court assumes without finding that First Union was Curtin's employer.  Because the Court finds that even if First Union were Curtin's employer, the IWCA bars Gould's intentional infliction of emotional distress and negligence claims against it, we need not determine whether First Union in fact was Curtin's employer.

IWCA); *Small v. Chicago Health Clubs, Inc.*, 843 F. Supp. 398, 403 (N.D. Ill. 1994) (negligence compensable under IWCA), the only issue before the Court is whether their conduct was accidental. "It is only when the employer acts with a specific intent to injure the employee that the resultant injury is stripped of its accidental character." *Mayfield v. ACME Barrel Co.*, 629 N.E.2d 690, 693 (1st Dist. 1994) (rejecting notion that reckless behavior or aggravated negligence is not "accidental" conduct under IWCA).

The very nature of Gould's negligence claim is that First Union and Evergreen did not act with specific intent. Therefore, she cannot avoid IWCA preemption by reliance on that exception. Accordingly, her negligence claim against First Union and Evergreen is barred by the IWCA.

Next, the Court must determine whether Gould's intentional infliction of emotional distress claim against Evergreen or First Union is barred by the IWCA. Gould's response in this regard is limited to the theory that they commanded or authorized Curtin's acts and thus the conduct was not accidental. Therefore, the Court focuses solely on that argument.

"Illinois courts have consistently interpreted the IWCA as barring employees' suits against employers for injuries intentionally inflicted by another employee, because such injuries are considered 'accidental,' that is, unexpected and unforeseeable, from both the injured employee's and the employer's points of view." *Alberts v. Wickes Lumber Co.*, No. 93 C 4397, 1995 WL 476654, at *3 (N.D. Ill. Aug. 9, 1995); *see Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004, 1016 (7th Cir. 1997); *Meerbrey v. Marshall Field & Co., Inc.*, 139 Ill. 2d 455, 463 (1990).

"The only exceptions to this rule arise when either the employer, or an employee who may be considered its alter ego, either intentionally inflicts the injuries upon the employee or expressly authorizes the conduct." *Alberts*, 1995 WL 476654, at *3. "But the fact that a supervisor was acting within the scope of his or her authority does not equal authorization by the employer for the commission of an intentional tort." *Hunt-Golliday*, 104 F.3d at 1017; *see Sarate v. Loop Transfer, Inc.*, No. 95 C 5671, 1997 WL 543068, at *6 (N.D. Ill. Aug. 28, 1997).

Gould opines that there is an issue of disputed fact as to whether First Union or Evergreen commanded or authorized the acts in question. Unfortunately for Gould, the statement of fact to which she points does not support her assertion that a triable issue exists. Accordingly, she has failed to preclude summary judgment in First Union and Evergreen's favor. (*Compare* Defs.' LR 56.1(a)(3) ¶ 158 (p. 24), *with* Pl.'s LR 56.1(b)(3)(A) ¶ 158 (p. 41).)

Paragraph 158 of defendants' statement of undisputed facts provides: "Evergreen did not instruct nor direct Curtin to engage in wrongful acts. (Curtin Dep. at 150-52.)" At the cited portion of Curtin's deposition, when asked, "Other than Joan Goodwin's advice to you that Noreen wanted this situation to be kept quite [sic], other than that, has any . . . of your superiors at First Union or Evergreen given you specific directions or orders pertaining to your handling of the situation involving the phone calls?", Curtin answered, "No." (Defs.' LR 56.1(a)(3) ¶ 158 (p. 24).)

Although Gould argues otherwise, Curtin's deposition supports the statement in paragraph 158 because the conduct of which she complains is Curtin's dismissal and minimization of, as well as harassment, intimidation, and antagonism due to, her

emotional distress after the phone calls from Barrett. After all, Gould's theory behind her later-discussed discrimination claim, as well as her intentional tort claim, is that Curtin allegedly mistreated her up to and including the time of her termination because he thought she overreacted (and in support of her discrimination claim, stereotypically reacted) to the phone calls.

Further, she fails to point to any portion in the record that supports an assertion that the statement in paragraph 158 is untrue. She merely relies on Curtin's further testimony stating that he could not recall anyone directing or instructing him to treat Gould in any particular way regarding the phone calls. (Pl.'s LR 56.1(b)(3)(A) ¶ 158 (p. 41).) Her reliance on these statements, however, does nothing to support a denial of defendants' statement of fact in paragraph 158. Further, it is undisputed that "[n]obody ever told Curtin the manner in which he should conduct himself with respect to Noreen Gould following her receipt of the Barrett phone calls." (Pl.'s LR 56.1(b)(3)(B) ¶¶ 94-95.) Accordingly, the Court grants First Union and Evergreen's summary judgment motion to dismiss the intentional infliction of emotional distress claim (Count V) and the negligence claim (Count VI) against them.

## II. Intentional Infliction of Emotional Distress Claim Against Curtin

Curtin argues that the Court must grant the summary judgment motion because even if Gould's version of the facts is true, she fails to state a claim as a matter of law. The Court agrees.

Under Illinois law, the elements of a cause of action for intentional infliction of emotional distress are as follows:

> First, the conduct involved must be truly extreme and outrageous.
> Second, the actor must either intend that his conduct inflict severe
> emotional distress, or know that there is at least a high probability that this
> conduct will cause severe emotional distress. Third, the conduct must in
> fact cause severe emotional distress.

*McGrath v. Fahey*, 533 N.E. 2d 806, 809 (Ill. 1988). To be extreme and outrageous,

defendant's conduct must go beyond "mere insults, indignities, threats, annoyances, petty

oppressions or trivialities." *Public Fin. Corp. v. Davis*, 360 N.E. 2d 765, 767 (Ill. 1976).

"Liability has been found only where the conduct has been so outrageous in character,

and so extreme in degree, as to go beyond all possible bounds of decency." *Id.*

> First, the more power and control that a defendant has over a plaintiff, the
> more likely defendant's conduct will be deemed outrageous. This factor
> should be viewed in conjunction with a second factor: whether the
> defendant reasonably believed that his objective was legitimate. A
> reasonable belief that his objective was legitimate does not automatically
> allow the defendant to pursue that objective by outrageous means, but it is
> a substantial factor in evaluating the outrageousness of the conduct.
> Another consideration is the defendant's awareness that the plaintiff is
> particularly susceptible to emotional distress.

*Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 866-67 (1st Dist. 2000).

When a plaintiff is suing her employer for intentional infliction of emotional

distress, the "showing of 'extreme and outrageous behavior is more strictly applied . . .

.'" *Figueroa v. City of Chicago*, No. 97 C 8861, 2000 WL 283080, at *11 (N.D. Ill. Mar.

3, 2000). "Courts are concerned that, if everyday job stresses resulting from discipline,

personality conflicts, job transfers or even terminations could give rise to a cause of

action for intentional infliction of emotional distress, nearly every employee would have

a cause of action." *Graham*, 742 N.E.2d at 867.

Accordingly, "courts have found extreme and outrageous behavior to exist in the

employer/employee context where the employer clearly abuses the power it holds over an

employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." *Honaker v. Smith*, 256 F.3d 477, 491 (7th Cir. 2001). "Courts have found outrageous behavior where defendants threatened to exercise their power to coerce plaintiffs into doing something they would not otherwise do." *Graham*, 742 N.E.2d at 867.

With these precepts in mind, the Court examines the particular facts of this case. First, Gould states that within a seventeen-day period, starting on May 27, 1999, Gould received a series of seven voice mail messages to her work phone number, three of which consist solely of recorded music, four of which consist of recorded music, pounding sounds, and insulting remarks and offensive language in an intimidating voice. (Defs.' LR 56.1(a)(3) ¶¶ 51, 52, 55.) On July 9, she told Curtin, her direct supervisor and Senior Vice President National Sales Manager about the phone calls and Curtin said, "Remember Noreen, we have a promotion and you need to stay focused on that." (*Id.* ¶ 62; Pl.'s LR 56.1(b)(3)(B) ¶¶ 2-3.)

On July 11, Gould received two voice mail messages at work, one of which consisted of insulting remarks and offensive language in an intimidating voice, another of which consisted of a threat to physically hurt and kill Gould. (Defs.' LR 56.1(a)(3) ¶¶ 51, 52, 55, 62.) She forwarded them immediately to Curtin. (*Id.* ¶ 65.) On July 12, Gould then received a voice mail from Curtin stating:

> Hey Noreen, it's Tim. Wow, it's the first time I've heard. That's, uh, creepy. We're tracking it down ASAP. That is not fair. Sorry. Anything I can do, let me know, but I hope you can mentally get passed (sic) it, and realize that it's threatening only in regard that it's over the phone. If it's coming from as far away as Boston, that's obviously creepy, and hope you have a good, full week planned. Get passed (sic) it like I said. This week, you know, the week before the promo. Good luck. Take care. I'm in Charlotte. If you need anything just ring me or voicemail. I'll give you a call.

(*Id.* ¶ 69.) Gould was upset by Curtin's voice mail message because she felt his message meant she did not matter. (*Id.* ¶ 72.) According to Gould, "she was in a state of shock and thought, 'How could my manager treat these calls like this?' I am left alone. All they care about is how much business am I going to bring in. He didn't care about my safety. It was very demoralizing. I didn't feel valued. That voicemail put me in a frenzy." (*Id.* ¶ 74.)

Curtin's other conduct of which she complains is as follows. On August 17, Curtin called Gould to find out why she had failed to attend a mandatory meeting in Boston or even inform him of her absence with a courtesy call. (*Id.* ¶ 130.) Gould told Curtin that she was instructed not to speak with him about the "situation" and that if he had any communication problems, he should talk to Bill Ennis, Evergreen's CEO or Joan Goodwin, Evergreen's head of the human resources department and First Union's Vice President Human Resources. (*Id.* ¶¶ 36, 91; Pl.'s LR 56.1(b)(3)(B) ¶ 124.) She had told Ennis about not coming to Boston. (Pl.'s LR 56.1(b)(3)(A) ¶ 126.)

On August 19, Curtin called Gould and asked her if she was still working because she had not turned in any expense reports for the month of July. (Defs.' LR 56.1(a)(3) ¶ 137.) She "stopped" Curtin and told him: (1) that she did do her expenses for July but did them in the first or second week of August; (2) that "all he cared about was the almighty dollar," (3) that she felt she was being harassed; (4) again that Ennis had told her not to speak to Curtin about "the situation"; (5) that if Curtin didn't like it he could call her attorney; and (6) the instant conversation was being documented and was now "over." (*Id.* ¶¶ 137, 140.) It is undisputed that Gould did not speak to Curtin, or vice versa, after August 19. (Defs.' LR 56.1(a)(3) ¶ 181.)

On August 20, Gould received revised 1999 sales goals via facsimile. (*Id.* ¶ 164.) It is undisputed that Curtin changed all of his wholesalers' stated sales goals two or three times in 1999 to achieve an accurate "footing" or total. (*Id.* ¶ 163.) It is undisputed that Gould met her stated sales goal for 1999. (Pl.'s LR 56.1(b)(3)(B) ¶ 34.) On January 3, 2000, based on her own assessment of information given to her by others, including Curtin, Mary Ann Bruce, president of Evergreen Investment Services terminated Gould's employment. (*Id.* ¶¶ 171-205.)

According to Gould, all of the above-mentioned conduct is evidence that Curtin "conducted himself in a dismissive and antagonistic manner so as to make it unreasonably difficult for Noreen to continue her job duties under his supervision." (Pl.'s LR 56.1(b)(3)(A) ¶ 156.) In addition Curtin's conduct increased her emotional distress, anxiety, and fear. (*Id.*)

Assuming every fact that Gould alleges is true and reading Curtin's phone message and other dialogue in the light most favorable to her, *i.e.*, in the most sarcastic, hostile, demeaning and dismissive tone of voice, the Court finds, as a matter of law, that no rational jury could find that Curtin's conduct was extreme and outrageous. Nor would it be the first time that a court held that a plaintiff failed to establish extreme and outrageous conduct where an employer ignored an employee's concern for personal safety, reprimanded her for perceived shortcomings, accused her of poor sales despite having made her sales quota, excluded her, failed to advise her of policy changes, and made it extremely difficult for her to continue working. *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993); *see also Burgess v. Chicago Sun-Times*, 476 N.E.2d 1284, 1289 (1st Dist. 1985) (stating that employer's (1) ignoring newspaper

deliverer's personal safety concerns by insisting that he continue to work on same route in which he had been victim of assault and armed robbery, (2) making him pay for goods that were stolen from him and (3) constructively discharging him did not sufficiently allege extreme and outrageous conduct).

The Court has reviewed all of the facts in a light most favorable to Gould. It has considered Curtin's conduct in relation to the power and control he had over Gould as her supervisor, Curtin's objective of ensuring work got done, and Curtin's awareness of the fact that Gould had received, from an anonymous male caller at a phone number in the Boston area, numerous phone messages, consisting of insulting remarks, offensive language, and a death threat. In this case, there is no evidence that Curtin threatened to exercise his power to coerce Gould into doing something she would not otherwise have done or to coerce her into doing something illegal.

While it is clear that Curtin's reaction to Gould's situation and subsequent conduct may have been hard-hearted, unenlightened, and reminiscent of the Charles Dickens character Ebenezer Scrooge prior to his eventual transformation, the Court holds that, as a matter of law, Illinois law requires more in order to establish extreme and outrageous character in the employment context. *See Piech v. Arthur Andersen & Co., S.C.*, 841 F. Supp. 825, 831-32 (N.D. Ill. 1994) (citing *Pavilon v. Kaferly*, 561 N.E.2d 1245, 1251-52 (1st Dist. 1990) (defendant knew plaintiff was susceptible to emotional distress, pressured plaintiff for dates, offered plaintiff money for sex, threatened to kill and rape plaintiff and threatened to challenge custody of her child); *Milton v. Ill. Bell Tel. Co.*, 427 N.E.2d 829, 832-33 (1st Dist. 1981) (plaintiff coerced to falsify work reports, an illegal activity)). Accordingly, the Court grants the Evergreen defendants' motion for

summary judgment as to Gould's claim for intentional infliction of emotional distress (Count V).

### III.  Title VII Sex Harassment, Retaliation, and Gender Discrimination

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). Title VII also makes it unlawful for an employer to retaliate against any of its employees for opposing an unlawful, discriminatory employment practice.  42 U.S.C. § 2000e-3(a).

Gould has sued Evergreen for sex harassment in the form of a hostile work environment, as well as for retaliation and sex discrimination. The Court addresses each in turn.

### A. Sexual Harassment

A plaintiff can establish a violation of Title VII by proving that discrimination based on  gender has resulted in a hostile or abusive work environment. *Meritor Sav. Bank, F.S.B. v. Vinson*, 477 U.S. 57, 67 (1986).  "[S]exual harassment that does not involve a supervisor's extorting sexual favors, that instead involves the creation of a hostile work environment, must be sufficiently severe or pervasive to make the workplace intolerable for the members of the group discriminated against." *Minor v. Ivy Tech State Coll.*, 174 F.3d 855, 857 (7th Cir. 1999).  "The workplace that is actionable is the one that is 'hellish.'" *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995).

Accordingly, "[t]he standard for such harassment in this circuit is fairly hard to meet." *Eager v. Commonwealth Edison Co.*, No. 01 C 3159, 2002 WL 252461, at *3 (N.D. Ill. Feb. 20, 2002). To assess the magnitude of the complained of conduct, the court examines all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Smith v. Sheahan*, 189 F.3d 529, 533-34 (7th Cir. 1999).

Gould contends that Curtin created a hostile work environment when he: (1) belittled her concerns regarding the calls from Barrett by telling her to "get past it" during a single phone conversation on July 12, 1999; (2) asked her if she was still working because he believed she had not turned in her expense reports for July in a phone conversation on August 19; (3) changed her stated sales goal on August 20, and (4) did not speak to her between August 19, 1999 and January 3, 2000, the date of her termination. (Pl.'s Resp. Mot. Summ. J. at 20.)[8] Viewed in the light most favorable to Gould, Curtin's conduct was insufficiently severe or pervasive such that it would unreasonably interfere with her work performance.

It is undisputed that Gould told Curtin on August 19 that if he wanted to speak to her he could do so through her attorney and thereafter made no effort to speak to Curtin between August 19 and January 3. In addition, the modification of her stated sales goal was not so hellish or intolerable given her circumstances because it is undisputed that she met her stated sales goal as modified. Further, although his advice to Gould that she

---

[8] To the extent that Gould relies on conduct not mentioned in her response brief and provides a reasonably specific citation in support, the Court finds that such conduct, even when considered with the conduct addressed in her response brief, is too sporadic, trivial, vague, speculative, or is simply irrelevant to establish a hostile work environment. (*See* Pl.'s LR 56.1(b)(3)(A) ¶ 176.)

mentally "get past" the threatening phone calls may have been insensitive and harsh, his conduct was not so severe or pervasive as to alter significantly the conditions of her employment. Moreover, Gould has provided no evidence that the conduct complained of, even if it were to rise to the level of a material change in work environment, is in any way motivated by, or based on, her sex. Accordingly, such conduct, even in wake of Barrett's threatening phone calls, does not rise to the level of a hostile work environment.

## B. Retaliation

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The Seventh Circuit very recently clarified the proper standard for summary judgment in Title VII claims:

> The plaintiff in a retaliation case should have two (and only two) distinct routes to obtaining/preventing summary judgment. One, the more straightforward, the one that is unrelated to *McDonnell Douglas*, is to present direct evidence (evidence that establishes without resort to inferences from circumstantial evidence) that he engaged in protected activity . . . and as a result suffered the adverse employment action of which he complains. If the evidence is uncontradicted, the plaintiff is entitled to summary judgment. If it is contradicted, the case must be tried unless the defendant presents unrebutted evidence that he would have taken the adverse employment action against plaintiff even if he had had no retaliatory motive; in that event the defendant is entitled to summary judgment because he has shown that the plaintiff wasn't harmed by retaliation.
> * * *
> The second route to summary judgment, the adaptation of the *McDonnell Douglas* to the retaliation context, requires the plaintiff to show that after filing the charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse

employment action even though he was performing his job in a satisfactory manner. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment. Otherwise there must be a trial.

*Stone v. Ind. Publ. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

When viewing all disputed facts in Gould's favor, the Court holds that Gould does not prevail under either route enunciated in *Stone*. Gould has not provided adequate direct evidence of retaliation and cannot prevail in establishing retaliation via circumstantial evidence because Evergreen has presented unrebutted evidence of nondiscriminatory reasons for her termination.

It is undisputed that Gould filed her charge of gender discrimination, retaliation, and sex harassment *after* Evergreen terminated her. Therefore, she can not claim that Evergreen retaliated against her because of her EEOC charge. However, she attempts to establish that Evergreen retaliated against her based on her opposition to and complaints of unlawful discriminatory practices. *See* 42 U.S.C. § 2000e-3(a). Viewing all disputed facts in Gould's favor, the Court assumes as true that Gould told Goodwin as early as July 1999 that she felt that the "environment was not supportive of woman" and that "any women who had a complaint was sent out to pasture" and that Gould told Curtin on August 19, 1999, that she felt she was being harassed. (Pl.'s LR 56.1(b)(3)(A) ¶ 180; Pl.'s LR 56.1(b)(3)(B) ¶ 80.) With these facts taken as true, Gould has engaged in statutorily protected expression.

Possible direct evidence upon which Gould could rely in this case is the timing between her statements to Goodwin and Curtin and her termination. With regard to the determination of a causal link, "[t]he obvious place to start is the temporal sequence

21

between the two; oftentimes it is unnecessary to look any further." *Sweeney v. West*, 149 F.3d 550, 557 (7th Cir. 1998). "[M]ere temporal proximity between the [statutorily protected expression] . . . and the action alleged to have been taken in retaliation for that [expression] . . . will rarely be sufficient in and of itself to create a triable issue." *Stone*, 281 F.3d at 644 (listing cases).

The Court finds that the four to five month interval between Gould's complaints to Goodwin and Curtin and her termination, in and of itself, is insufficient evidence to create a triable issue that Evergreen's termination of her was retaliatory. This Court is not the first to reach this conclusion. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir. 2000) (three-month gap insufficient); *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, (7th Cir. 1999) (four-month gap insufficient); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998) (five-month gap insufficient).

In sum, the Court finds that Gould fails to provide sufficient direct evidence to establish a triable issue of retaliation. Even if she could do so, she has failed to establish a causal nexus because Evergreen presents unrebutted reasons for her dismissal.

Next, Gould does not prevail under the adaptation of the *McDonnell Douglas* burden-shifting analysis for retaliation claims. Even if Gould could establish a *prima facie* case of retaliation, she has not rebutted, and in fact has admitted, two of the reasons for her termination. *Stone*, 281 F.3d at 644.

First, it is undisputed that Mary Ann Bruce testified that one of the reasons Gould was fired was her failure to communicate with her supervisor, Curtin. (Defs.' LR 56.1(a)(3) ¶ 170.) It is undisputed that Gould did not speak to Curtin again after she told him on August 19, 1999 that if he wanted to speak with her again, he could do so through

her attorney. (*Id.* ¶ 181.) Gould was terminated on January 3, 2000. (*Id.* ¶ 10.) Thus, Gould did not speak to her boss for over four and a half months. It is undisputed that prior to August 19, 1999, when she told him to only speak to her through her attorney, she spoke to Curtin on a regular basis and during weekly conference calls. (*Id.* ¶¶ 29, 30.) Further, Gould does not even argue that she attempted to communicate with her boss during that time. Accordingly she has not rebutted one of Evergreen's stated reasons for her termination. In a case such as this, Gould's failure is fatal to her retaliation claim and, ultimately, to her sex discrimination claim as discussed below. *See Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 600 (7th Cir. 2001) (stating pretext stage of burden-shifting paradigm for retaliation and sex discrimination claims is same).

Second, it is undisputed that Mary Ann Bruce stated that one of the reasons Gould was fired was her failure to provide any work calendars after August 1999. (Defs.' LR 56.1(a)(3) ¶ 170.) Gould admits that she did not do so. (*Compare id.* ¶ 167, *with* Pl.'s LR 56.1(b)(3)(A) ¶ 167.) It is undisputed that Bruce terminated at least six wholesalers for reasons which included untimely reporting. (Defs.' LR 56.1(a)(3) ¶ 166.) Further, the Court holds that Gould cannot create a triable issue as to whether she turned in all of her call reports via the Onyx computer system. The affidavit upon which she relies to establish this fact statement plainly contradicts her deposition testimony, *compare* Gould Aff. Filed 6/7/01 ¶ 6 *with* Defs.' Ex. B, Gould Dep. at 184-85, and her affidavit offers no suitable explanation for the discrepancy. *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1055 (7th Cir. 2000); *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 531-32 (7th Cir. 1999). Therefore, Gould is stuck with her admission. Again, as above, her failure to rebut one of Evergreen's noninvidious reasons for her termination sounds the death knell

to her retaliation claim as well as her sex discrimination claim.

## C. Sex Discrimination

A Title VII plaintiff "may attempt to prove discrimination directly by presenting direct or circumstantial evidence that the impermissible factor was the determining factor in the employment action (the 'mixed motives' method) or the plaintiff may employ the indirect ('pretext') method of proof originally set out for Title VII actions in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Alzona v. Mid-States Corp. Fed'l Credit Union*, No. 92 C 8244, 1995 WL 134767, at *2 (N.D. Ill. Mar. 28, 1995).

Based upon the undisputed facts and a reading of any disputed facts in a light most favorable to Gould, she has not established a triable issue as to whether her gender was the substantial or determining factor in her termination. She has offered nothing but her own speculation that Curtin was motivated to recommend to Bruce that she terminate Gould because Gould was a woman.

Because Gould has failed to create a triable issue as to whether gender was a substantial factor in Evergreen's decision to terminate her, she may next employ the *McDonnell Douglas* burden-shifting paradigm. To survive summary judgment on her sexual discrimination claim, plaintiff must establish (1) she is a member of a protected class; (2) she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) the defendant treated similarly situated employees outside her class more favorably. *Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 876 (7th Cir. 1999). If Gould satisfies this test with evidentiary-quality materials, the burden shifts to defendant to demonstrate a legitimate business reason for the action. *See Russell v. Bd. of Trustees*

*of Univ. of Ill. at Chicago*, 243 F.3d 336, 340 (7th Cir. 2001). If the defendant can show a legitimate business reasons, plaintiff must offer evidence that defendant's business reasons are pretextual. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508 (1993).

Gould has failed to meet her burden of establishing a *prima facie* case of sex discrimination because she has not raised a triable issue as to whether similarly situated males were treated differently. Apparently, Gould mistakenly thought it was defendant's burden. (*See* Pl.'s Resp. Mot. Summ. J. at 18 ("There is no evidence in the record that there were in fact other Evergreen wholesalers that were similarly situated to Plaintiff. How many wholesalers were employed, whether they were similar to Plaintiff in experience, years of service, sales goals, sales accomplishments, etc. is left to the imagination.").) However, the onus is on her and she has not carried the day.

The male employees Gould opines are similarly situated are Evergreen wholesalers with the initials P.I., C.S., S.F. and a fourth unnamed wholesaler. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 21-24, 197-200.) P.I. was disciplined, put on probation, and went through a couple of written warning periods for poor sales before he was terminated. (*Id.* ¶¶ 21-24.) C.S. was put on probation, was warned, and put on probation again for poor sales prior to his resignation. (*Id.* ¶¶ 197-98.) S.F. had "expense issues" and a history of attitude problems and not submitting expenses on time and Bruce terminated him. (*Id.* ¶ 199.) Another unnamed wholesaler had a bad attitude and a sales to match and he was told he was not wanted at Evergreen but was allowed to join a sister company. (*Id.* ¶ 200.)

Unfortunately for Gould, poor sales and violating expense policy were just two of the many reasons Evergreen stated for terminating her. The record is devoid of evidence

that any of the aforementioned wholesalers failed to turn in their work calendars and call reports for four and a half months or refused to talk to their supervisor unless it was through an attorney. Accordingly, the Court finds these male employees are not similarly situated to Gould.

Even if Gould could establish a *prima facie* case of sex discrimination, the Court would still grant Evergreen's motion for summary judgment because she ultimately fails to raise a triable issue as to each and every one of Evergreen's stated legitimate, nondiscriminatory reasons for terminating her. Plaintiff's "burden is to squarely rebut the articulated reason for his discharge." *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 349 (7th Cir. 1997). "The existence of a genuine issue of triable fact with respect to some of the reasons for discharge proffered by the employer is of no consequence as long as at least one reason is uncontested." *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 399 (7th Cir. 1998). For the same reasons discussed above with regard to Gould's failure to establish a triable issue of pretext as to her retaliation claim, we find Gould also fails to do establish a triable issue as to pretext with regard to her sex discrimination claim.

In sum, Gould has not created a triable issue as to whether the aggrieved of conduct in this case rose to the level of a hostile work environment based on her sex. Further, there is no genuine issue as to a material fact regarding whether she was retaliated against for statutorily protected expression or discriminated against based on gender. Accordingly, the Court grants Evergreen's motion for summary judgment as to Gould's Title VII claims (Count VII).

## IV.  Illinois Wage Payment and Collection Act ("IWPCA")

Finally, the Court must determine whether summary judgment should be entered in Evergreen's favor or whether there is a triable issue with regard to Gould's IWCPA claim.

The IWPCA provides in pertinent part:

> Payments to separated employees shall be termed 'final compensation' and shall be defined as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties.

820 ILL. COMP. STAT. 115/2.

The following facts are undisputed. Gould bases her IWPCA claim on Evergreen's failure to pay her $40,840 in outstanding unpaid commissions and a $50,000 non-recurring retention payment. (*Compare* Defs.' LR 56.1(a)(3) ¶ 186, *with* Pl.'s LR 56.1(b)(3)(A) ¶ 186; LR 56.1 ("All material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statements of the opposing party").

The terms and conditions of her compensation in 1999 were set forth in a letter June 11, 1999. (Defs.' LR 56.1(a)(3) ¶ 187.) Gould's base salary was guaranteed to be $75,000.00. (Pl.'s LR 56.1(b)(3)(B) ¶ 92.) Her commissions for 1999 were guaranteed to be $100,000.00. (*Id.* ¶ 93.) Gould was guaranteed this total compensation of $175,000 only if she met certain conditions including, but not limited to: (1) being an

Evergreen employee who was in good standing as of December 31, 1999, and who was on course to achieve an overall performance rating of at least "meets expectations;" and (2) fully complying with all applicable administrative and personnel policy requirements. (Defs.' LR 56.1(a)(3) ¶ 188.) Gould was eligible for a non-recurring retention payment of $50,000 only if she (1) "remained an employee in good standing with Evergreen through June 30, 2000;" and (2) "achieved at a minimum a 'meets expectations' rating on her 1999 performance review." (*Id.* ¶ 189.)

Evergreen argues that summary judgment is proper because Gould failed to meet all of the conditions precedent required for either the unpaid commissions or the non-recurring retention bonus. Evergreen opines Gould was not an employee in good standing as of December 31, 1999 or through June 30, 2000 and she did not receive, and was not on course to receive, at a minimum a "meets expectations on her 1999 performance review" because she was terminated on January 3, 2000.

In *Camillo v. Wal-Mart Stores, Inc.*, the court found that where a benefits plan provides employees are paid a bonus each year if they are on the payroll on a particular date, and the employer subsequently makes it impossible for an employee to fulfill the condition because the employer terminates the employee, the employee should receive a *pro rata* share of the bonus. *Camillo v. Wal-Mart Stores, Inc.*, 582 N.E.2d at 732-34 (5th Dist. 1991). This is because "a party to a contract may not take advantage of a condition precedent the performance of which he has rendered impossible." *Id.* at 733.

In light of *Camillo*, based on the paucity of facts in the record regarding Evergreen's commission payment system and its practice of paying wholesalers a non-recurring retention payment as well as the lack of evidence regarding when commissions

and retention payments were to be paid out under the contract to Gould, the Court is unable to determine whether or not Evergreen is liable under the IWCPA. Therefore, the Court denies Evergreen's motion for summary judgment as to Count VIII.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the Evergreen defendants' summary judgment motion [doc. no. 36-1]. The Court grants the motion as to Count V (intentional infliction of emotional distress), Count VI (negligence), and Count VII (Title VII claims) and hereby dismisses those counts. The Court denies the motion as to Count VIII, Gould's claim under the Illinois Wage Payment and Collection Act. Because all of the claims against Tim Curtin and First Union Corp. have been dismissed, the Court hereby terminates them as parties. Only Barrett and Evergreen remain as defendants.

**SO ORDERED:**                    **ENTER:**

HON. RONALD A. GUZMAN
United States Judge
3/29/02